**OMAN et al. v. UNITED STATES.**

No. 4302.

United States Court of Appeals
Tenth Circuit.

March 19, 1952.

Milton V. Backman, Salt Lake City, Utah (Milton A. Oman, Salt Lake City, Utah, on the brief), for appellants.

John C. Harrington, Washington, D. C. (Wm. Amory Underhill, Washington, D. C., Scott M. Matheson, Salt Lake City, Utah,

and Roger P. Marquis, Washington, D. C., on the brief), for appellee.

Before PHILLIPS, Chief Judge, and BRATTON and MURRAH, Circuit Judges.

MURRAH, Circuit Judge.

This is an appeal from a judgment of the United States District Court of Utah, denying the appellants' claim under the Tort Claims Act, 28 U.S.C. § 1346, for alleged tortuous acts of agents of the United States in the administration of the Taylor Grazing Act, as amended, 43 U.S.C.A. 315 et seq., and the Federal Range Code, 43 C.F.R. Sec. 161.1 et seq. When the case was here in 179 F.2d 738, we epitomized and construed the complaint as charging the District Grazer of the San Rafael Grazing District with tortuously aiding and encouraging other livestock operators in the District to utilize the public domain within the Grazing District, upon which appellants had been previously granted exclusive grazing privileges as owners of base land and as transferees of their predecessors in interest; and wrongfully refusing to cancel the permits of such predecessors in interest.

In holding the complaint valid as against the defense that the acts complained of involved an excepted discretionary action, we said that no Government employee is granted a discretion whether he shall induce or incite third persons to interfere with exclusive rights or privileges granted by the United States. We recognized, however, the discretionary authority of the District Grazer to grant or withhold grazing privileges; and to revoke or cancel the same, so long as he observes the procedural safeguards set up in the Range Code.

More recently in Chournos v. United States, 10 Cir., 193 F.2d 321, we reviewed the purpose of the Taylor Grazing Act to stabilize the livestock industry by utilizing the Western public domain according to the needs and qualifications of livestock operators with base holdings and to that end authorize those charged with the administration of the Act to exercise their judgment and discretion in granting permits and determining the extent to which lands within the District shall be grazed.

A trial of the case on the complaint developed the following pertinent facts: For many years past, the Oman family has owned land now included in the San Rafael Grazing District in Utah, and has grazed cattle and sheep on the adjacent public domain. On July 13, 1942, the Omans and eight or nine other grazers entered into a range line agreement, recognized by the grazing authorities, under the terms of which the Omans were granted exclusive grazing privileges on a V-shaped body of land, known as Telephone Bench, located between Trail Canyon on the north and Wright Canyon on the south, embracing roughly Sections 4, 5, 6, 9 and 10, Township 14 south, Range 8 east, Carbon County, Utah. They were also conceded privileges in common with Weeks in Sections 11 and 12, located east of the apex of the V-shaped land. The ownership and control of these lands gave the Omans a priority for the grazing of 155 head of cattle and 25 head of horses. In January 1946, the Omans acquired a ten-year lease on 3470 acres of state land lying south of the home ranch, in Sections 7, 16, 18, 19, 20 and 29, Township 14 south, Range 8 east, and also a ten-year lease on the Oak Spring Ranch consisting of 1640 acres, and the Storrs Ranch, both lying northeast of the home ranch in Sections 21, 26, 27, 28, 33, 35 and 36, Township 13 south, Range 8 east.

The state lands carried no priority for grazing upon the public lands. They had been formerly leased to Chris Versamis and Gus Nicolodemus, who had grazing permits for 1705 head of sheep in Unit One of the Grazing District, based upon their ownership of other land in either the immediate vicinity or elsewhere. This permit was recognized in the 1942 range line agreement. Both the Oak Spring and Storrs Ranches carried priority for grazing on adjacent public lands, and they were leased directly from George Telonis, who held permits for the grazing of 2630 sheep in Unit One of the Grazing District, based partly upon his lease of the Storrs Ranch and partly upon his ownership or control of lands located in the high country north

and west of the Oak Spring and Storrs Ranches in Township 13 south, Range 7 east. These privileges were also recognized in the 1942 range line agreement.

After acquisition of the state land and the Oak Spring and Storrs Ranches, the Omans so advised District Grazer Dillard on January 10, 1947, and formally applied for exclusive permission to graze 500 cattle and 25 horses from April 1, 1947 to March 31, 1948, on the entire area within the perimeter of all the lands owned, leased or on which they or their predecessors in interest held grazing permits. Ten per cent of the land in this area was public domain and ninty per cent privately owned. The application also requested that the grazing privileges heretofore granted for sheep be changed to cattle. It was duly referred to the District Advisory Board, which on February 24, 1947, allowed the permits for 155 head of cattle and 5 head of horses, as before. It also recommended that the permit be recognized for the same number of sheep heretofore granted to George Telonis, and the proposed transfer from sheep to cattle be held for investigation to determine the effect upon the other users of the range. The applicant was given until March 4, 1947, to protest these recommendations.

Pursuant to the protest hearing on March 4 and 5, the District Grazer advised the Omans on March 15, 1947, that they had been granted a license for grazing 139 additional head of cattle, making a total of 294, and 5 head of horses, and that their application as to the other cattle and horses was rejected. They were given fifteen days to appeal from this order. The minutes of the meeting of the Advisory Board on March 4 and 5 reflect a recommendation that the Telonis permit be reduced by 696 sheep, or the equivalent of the permit for the additional 139 head of cattle granted to the Omans. The Advisory Board also recommended that a committee composed of Dillard and others be appointed to "go up and investigate and decide as to the boundary lines connected with the Oman permit, together with the permittees' interest in the Oman allotment." There was testimony to the effect that immediately after the ad-

journment of the Board meeting, Dillard told Milt Oman of the action of the Board, and also offered to call a meeting of the committee for the purpose of making the recommended investigation for the establishment of the range lines at any time convenient to the Omans, and that Oman replied that he would get in touch with him. For reasons not altogether clear in the record, the committee did not meet for more than two years.

Meanwhile, the Omans appealed from the order of the District Grazer, complaining that it "fails to set forth any area of range upon which the livestock approved for grazing privileges are to graze." This appeal was not called for hearing until May 1949. In the meantime, and in 1948, the Omans repeated their 1947 application for 500 head of cattle and 25 horses, and similar action was taken by the Advisory Board. No appeal was taken from the action on the 1948 application. The record shows that although the Advisory Board recommended the reduction of the Telonis permit by 696 sheep, and the Omans were granted a permit for the equivalent for cattle, Telonis was formally granted a permit to graze the same number of sheep in 1947 as in 1946, and his permit was not officially reduced by the District Grazer until 1948. On April 23, 1947, Dillard, by letter to Telonis, gave him a temporary allotment to graze on the federal range in Sections 1 and 12, north of Gordon Creek, Township 14 south, Range 8 east, and Sections 4, 5, 6, 7, 8, 9, 10, 11 and part of 3, "that lies south of creek running through Sections 3 and 4", and that he was to stay on the south side of the creek.

The Omans contend that this letter was specific authority for Telonis to graze upon that part of the federal range on which they were granted exclusive grazing privileges, as transferees of the Oak Spring and Storrs Ranches from Telonis; that by this action, Dillard wrongfully and deliberately granted Telonis the right to graze upon lands to which they were exclusively entitled, and that he did, in the summers of 1947 and 1948, graze his sheep upon these lands, thereby destroying them for cattle grazing; that as a result of this and Dillard's arbi-

trary action in forcing them to move their cattle from the federal range north of the Oak Spring Ranch in the summer of 1948 to the V-shaped area, they lost great numbers of cattle and suffered damages, of which they complain.

After this action was filed, and just before the Omans' appeal from the District Grazer's order of March 15, 1947, was to be heard, Dillard and the Omans entered into an agreement on May 6, 1949, approved by the Regional Chief of Range Management, under the terms of which the Omans were granted substantially all of the grazing privileges applied for in 1947, and the Omans point to this agreement as recognition of their legal rights, and as evidence of Dillard's arbitrary and tortuous acts in depriving them of their range privileges for the years 1947 and 1948. They further complain of damages to their range in the summer of 1948 by permitting Versamis and Nicolodemus to graze their sheep across the Omans' range which lies between the public domain on which Versamis and Nicolodemus held grazing permits for sheep.

Dillard explained that since the state land south of the home ranch did not carry priority, the Omans did not acquire grazing privileges as transferees of such land, and since Versamis and Nicolodemus held grazing permits on the adjacent public domain, they were not trespassers in that area. Moreover, there is nothing in the record to indicate that the District Grazer in any way encouraged Versamis and Nicolodemus to graze their sheep upon the Omans' land or land included in their permit. He also explained his letter to Telonis of April 23, 1947, stating that he had specifically directed Telonis to graze his sheep on Sections 1 and 12, where Telonis had previously enjoyed grazing privileges, and that his designation of Sections 4, 5, 6, 7, 8, 9, 10, 11 and part of 3, had reference to public domain lying east of the land included in the Omans' permit in Range 9 and not Range 8. He testified to having taken Telonis upon this land and explaining to him, through an interpreter, just what lands he was to graze.

From all of the evidence, the court specifically found that the Government agents had at no time aided, allowed or encouraged other livestock operators to make use of the public domain to the Omans' damage; that they never at any time even suggested to any of such livestock operators that they go upon Omans' private land or any part of the public domain which had been allotted to them for grazing livestock. The court found, consistently with Dillard's testimony, that he accompanied Telonis to the area involved and pointed out to him the public domain he was to graze, and that it did not include land exclusively granted to the Omans. The court went on to find that when, upon recommendation of the Advisory Board, the District Grazer granted the Omans a permit to graze an additional 139 head of cattle, as transferees of the Oak Spring and Storrs Ranches, at the same time decreasing Telonis' permit by 696 head of sheep, he thereby cancelled Telonis' permit to graze upon the adjacent public domain and transferred such right to the Omans.

The Omans' claim is necessarily based upon the premise that when, in March 1947, they were granted grazing privileges for 139 additional head of cattle, they were thereby accorded exclusive grazing privileges within the perimeter of the fee, leased and permit lands set out in their application, as amended, and that since the Telonis permit was reduced by the equivalent number of sheep, it was the duty of the Government to vouchsafe to the Omans the exclusive privileges granted. But from the record, it is clear that the Government did not intend to grant the Omans an exclusive permit to graze their 294 head of cattle and 5 horses on any particular public land within the District, except the V-shaped holdings, as to which the Omans had exclusive grazing privileges since 1942. As the trial court observed, neither the Advisory Board nor the District Grazer intended to grant the Omans exclusive grazing privileges on the public domain attached to the Oak Spring and Storrs Ranches until range line agreements could be adjusted after an investigation by a committee. Indeed, one of the grounds for an appeal from the District Grazer's order of March 15, 1947, was that

the permit did not designate the specific area where the Omans were to graze. Moreover, any ambiguity in a sovereign grant must be resolved in favor of the grantor. Nothing passes but that which is conveyed in clear and explicit language. Great Northern Ry. Co. v. United States, 315 U.S. 262, 62 S.Ct. 529, 86 L.Ed. 836. No exclusive right to graze the Omans' livestock upon the public domain, or any part thereof, can be read into the permit by implication simply because it decreased the Telonis permit by an equivalent amount. If Versamis and Nicolodemus trespassed on the Omans' home ranch, there is nothing to show that the Government tortuously aided, abetted or encouraged such trespass.

We conclude that the trial court's findings are supported by the evidence, are not clearly erroneous, and the judgment is affirmed.